# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Jeremy Weber,

|  |  |  |
|---|---|---|
| | Plaintiff, | Civ. No. 10-2142  (RHK/LIB) |
| v. | | **MEMORANDUM OPINION AND ORDER** |

The Travelers Home and Marine
Insurance Co.,

Defendants.

---

John E. Mack, Mack & Daby, P.A., New London, Minnesota, for Plaintiff.

Stacy E. Ertz, Daniel A. Haws, Kari L. Gunderman, Murnane Brandt, PA, St. Paul, Minnesota, for Defendant.

---

## INTRODUCTION

This action arises out of a fire at Plaintiff Jeremy Weber's home on September 14, 2009.  Weber filed a claim with his insurance company, Defendant Travelers Home and Marine Insurance Company ("Travelers"), which was denied.[1]  Weber then commenced this action, seeking to recover the policy proceeds.  Presently pending before the Court are (i) Weber's Motion for Partial Summary Judgment and to Amend the Complaint and (ii) Travelers' Motion for Summary Judgment.  For the reasons that follow, both Motions will be denied.

---

[1] Travelers did not expressly deny the claim but rather "reject[ed]" it on several grounds.  As discussed in more detail below, however, the Court finds this "rejection" functionally equivalent to a denial.

# BACKGROUND

The events leading up to the fire are not well explicated in the parties' briefs, even though they are critical to a full understanding of the parties' arguments. Many of the facts set forth below, therefore, are taken from the October 15, 2009 Investigation Report of Deputy State Fire Marshal John Steinbach, who investigated the fire's cause. (See 4/4/11 Mack Aff. Ex. E.)[2]

Through a contract for deed, Weber purchased a house in Sauk Centre, Minnesota, in October 2008. The purchase agreement required him to make $700 monthly payments to the house's previous owners. He obtained a policy from Travelers insuring the house and its contents. Among other things, the policy excluded coverage for any loss "arising out of any act an 'insured' commits or conspires to commit with the intent to cause a loss."

The policy imposed certain duties on Weber in the event of a loss, including cooperating with any investigation undertaken by Travelers, submitting a sworn proof of loss containing an inventory of damaged property, and sitting for an examination under oath. The policy also provided that "[n]o action can be brought against" Travelers if there were anything less than "full compliance with all of the terms" thereof.

---

[2] The report contains Steinbach's findings regarding the fire's origin, as well as statements and other information provided to him during his investigation. While the report itself appears to fall within a hearsay exception, see Fed. R. Evid. 803(8), statements made to Steinbach contained *within* the report would seem to be hearsay. Nevertheless, the Court may consider the entirety of the report because neither party has objected to it (save for Weber's objection to Steinbach's conclusions, which is addressed in more detail below). See Walker v. Wayne Cnty., Ia., 850 F.2d 433, 435 (8th Cir. 1988).

In March 2009, Weber was laid off from his job, and he was unable to find other employment.  Two months later, a fire in the house's kitchen, which Weber attributed to "bump[ing] a knob on the stove," caused significant damage.  He submitted a claim to Travelers, which paid him more than $52,000.  He then set about repairing the damage.  The interior of the house was largely gutted; most of the electrical supply was disconnected, and the house was stripped to the frame and contained no working appliances.  During remodeling, Weber lived in a travel trailer parked in his backyard.  The house was otherwise unoccupied.

According to Weber, on September 13, 2009, he was at his house until approximately 12:00 p.m.  After boarding up some windows and locking the doors, he drove, with his traveler trailer in tow, to Mabel Murphy's, a restaurant and bar in Fergus Falls, Minnesota, approximately 65 miles away along Interstate 94.  There, he watched a Vikings football game, after which he visited his brother and sister-in-law, who live near Fergus Falls.  He then returned to Mabel Murphy's, where he drank heavily and sang karaoke.  At approximately midnight he took his van to get gas and then returned to Mabel Murphy's' parking lot.  He went into his trailer, "got sick," and fell asleep.

Joanne McQuisten Moe, co-owner of Mabel Murphy's, recalls the events somewhat differently.  She told Steinbach that she had known Weber for 12 years and, although she was working the bar during the Vikings game, she did not see him there.  She recalled seeing him enter the bar at approximately 8:00 p.m., after which he drank and sang karaoke.  He left at approximately 12:30 a.m. on September 14, 2009; when she closed Mabel Murphy's at 2:00 a.m. and left the premises, she saw Weber's travel trailer

but did not see his van attached to it.  She acknowledged, however, that she did not search for the van, which may have been parked in a nearby lot where patrons often parked on weekends.

At approximately 4:00 a.m. on September 14, 2009, neighbors reported a fire at Weber's house.  Despite the efforts of the Sauk Centre Fire Department, the house was largely destroyed.  The walls on its west side collapsed and its northwest quadrant was reduced to several feet of ash.  The house's remaining sides were heavily damaged and in danger of collapsing.  Simply put, the house was a total loss.

Weber, who learned of the fire via a call on his cell phone at approximately 5:00 a.m., submitted a claim to Travelers for the damage.  The company, in turn, hired an independent investigator to analyze the origin and cause of the fire.[3]  It also asked Weber to submit within 60 days a form entitled "Sworn Statement in Proof of Loss," listing all damages he claimed, all property destroyed, and similar information.  It is clear from the record that Weber filled out and returned the form to Travelers, although neither party has submitted it to the Court.

Deputy State Fire Marshal Steinbach also undertook an investigation at the request of the Sauk Centre Fire Department.  That investigation included an examination of the scene, interviews with neighbors, and a review of Weber's financial records.  Those records revealed that Weber had maintained two checking accounts in 2009.  The first account had been charged overdraft fees on several occasions and had monthly ending balances between five and ten dollars; it was closed in May 2009.  The second account

---

[3] There is no evidence in the record regarding the outcome of this investigation.

was opened in January 2009 and had a beginning balance of 11 cents; the balance fell to zero in March. In June, approximately $46,000 was deposited into the account, likely the proceeds of Travelers' payment for the first fire. Several large withdrawals followed, and by September 15, 2009, the day after the fire, the account's balance had dropped to just under $600.

Steinbach also interviewed Weber at the Sauk Centre Police Department; there, he denied having set the fire. He also denied having any financial problems and indicated that he was current on his bills.[4] When Steinbach asked if he would be willing to take a polygraph examination, Weber refused. He then asked Steinbach whether he (Steinbach) was accusing him of having set the fire, and Steinbach answered in the affirmative. Weber then terminated the interview and said he wanted to consult an attorney.

Steinbach also conducted a criminal background check on Weber, which revealed a "lengthy criminal history," including "felony level burglary and theft convictions" and an "extensive criminal driving record." The nature and number of his prior convictions are not specified in the record.

Ultimately, Steinbach was unable to determine the fire's cause from the physical evidence. Nevertheless, he concluded in his October 15, 2009 report:

> Based on my training and experience and the scene examination, it is my opinion the fire in this residential house, which was damaged by a previous fire, originated in the northwest quadrant of the residence's basement. Due to severe fire damage and building collapse, I was unable to determine an exact area of origin and/or definitive cause for the fire. However, it is my

---

[4] Weber also stated that he had "no lawsuits or liens against him," although a background check revealed that he had two outstanding judgments against him in Otter Tail County, Minnesota, totaling approximately $1,900.

opinion this unoccupied residence damaged by a previous fire and undergoing extensive remodeling, including significant foundation work, was in all probability intentionally set on fire to destroy property and collect insurance monies. The property owner, who has owned the residence on a contract for deed for less than a year, has experienced two fires at the residence I consider to be in extremely poor condition, including a crumbling foundation. The unemployed property owner, who has felony level burglary convictions, maintains he's not involved with setting his house on fire and refuses to take a polygraph exam. I am closing this case and reserve the right to re-open it should newer information become available.

On November 10, 2009, Travelers wrote Weber and informed him that it would take his examination under oath regarding the fire on November 24, 2009, as permitted under the policy. Weber appeared with counsel and testified as requested; due to scheduling conflicts, however, the examination could not be completed on November 24. The parties agreed to continue it on January 18, 2010. In the interim, however, on January 7, 2010, Travelers wrote to Weber's counsel, advising him that it was

[r]ejecting the Sworn Statement [in] Proof of Loss as submitted by . . . Weber on the following grounds: The proof of loss includes amounts for additional living expenses which have not been established as actually incurred; the amounts of personal property and the value of that property ha[ve] not been proven nor ha[ve] [they] been established as accurate; the amount claimed for the structure has not been proven or established; and Travelers' investigation into this loss and claim will not be complete until such time as Mr. Weber's examination under oath is completed and the investigation by the fire marshal for the State of Minnesota is also completed.

The letter further advised that Weber could "submit a revised Sworn Statement [in] Proof of Loss . . . following the completion of [his] examination under oath."

Weber's examination under oath was completed on January 18, 2010. At the conclusion, he indicated that he wanted to read and sign the transcript of the examination,

but according to Travelers he never did so.  There also exists no evidence that he submitted a revised Sworn Statement in Proof of Loss following the completion of his examination.

On April 24, 2010, Weber commenced the instant action in the Stearns County, Minnesota District Court, alleging that Travelers' failure to pay his claim constituted breach of contract.  (Compl. ¶ VI.)  He further alleged that Travelers "has claimed, and continues to claim, that it does not have an obligation to pay . . . because [he] either burned the said residence by arson or caused another to burn [it]."  (Id. ¶ IX.)  He asserted that this arson defense was "made in bad faith and in conscious violation of [his] known rights."  (Id.)

Invoking diversity jurisdiction, Travelers timely removed the action to this Court.[5] It then answered the Complaint and asserted, *inter alia*, that Weber failed to comply with conditions precedent to suit and that his claims "may be barred by the [policy's] exclusion for intentional loss."  (Answer ¶¶ 18-21.)  The Magistrate Judge later issued a

---

[5] As the Court noted at oral argument, Travelers has taken inconsistent positions with regard to the amount in controversy.  In its Notice of Removal, it alleged that "the matter in controversy exceeds the sum or value of $75,000."  (Notice of Removal ¶ 3.)  Yet, in its Statement of the Case it averred that "as alleged by Plaintiff, *but not admitted by Travelers*, the matter in controversy exceeds the sum or value of $75,000."  (Doc. No. 7 at 1 (emphasis added).)  Travelers cannot have it both ways.  Regardless, there is no question that the amount in controversy exceeded $75,000 at the time of removal, insofar as Weber's house was a total loss and the policy's limit for dwelling coverage was $166,000.  (See 4/11/11 Gunderman Aff. Ex. 1.)  And although Weber's counsel suggested at the hearing that the amount-in-controversy requirement might no longer be satisfied due to payments Travelers made, following removal, to the contract-for-deed seller of Weber's home, it is well settled that "events occurring subsequent to removal which reduce the amount recoverable . . . do not oust the district court's [diversity] jurisdiction once it has attached."  St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 293 (1938).

Pretrial Scheduling Order setting October 1, 2010, as the deadline for amending the pleadings, and April 1, 2011, as the discovery cut-off.  (See Doc. No. 11.)

On January 20, 2011, Weber moved for partial summary judgment, seeking a determination that Travelers "has not established the affirmative defense of arson."  (Doc. No. 36.)  He noticed his Motion for a hearing on March 11, 2011 – before the close of discovery.  On February 4, 2011, Travelers cross-moved for summary judgment (Doc. No. 41), noticing its Motion for a hearing on May 23, 2011.  By Order dated March 1, 2011 (Doc. No. 45), the Court concluded to hear these Motions together, once discovery had closed.  Accordingly, it denied Weber's Motion without prejudice.

Following the close of discovery, Weber re-filed his partial-summary-judgment Motion (Doc. No. 46).[6]  However, he also added a request that the Court grant him leave to amend the Complaint "to include a count against [Travelers] of bad faith pursuant to Minn. Stat. § 604.18."  (Id. at 1-2.)  The Motion was set to be heard together with Travelers' Motion on May 23, 2011, but the hearing was continued to June 27, 2011. The Motions have been fully briefed and are now ripe for decision.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

---

[6] A subsequent entry in the docket (Doc. No. 54) also is styled as a "Motion for Partial Summary Judgment," but that document actually is Weber's Memorandum in support of his Motion.

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue of material fact for trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch.

Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this

approach is only slightly modified.  When considering Travelers' Motion, the Court

views the record in the light most favorable to Weber, and when considering Weber's

Motion, the Court views the record in the light most favorable to Travelers.  "Either way,

summary judgment is proper if the record demonstrates that there is no genuine issue as

to any material fact."  Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3

(D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, No. 10-3532, 2011 WL 873121 (8th Cir. Mar.

15, 2011).

## ANALYSIS

**I.      Weber's Motion will be denied**

      **A.      The arson defense**

            **1.      <u>Quast</u>**

In his Motion, Weber mounts a frontal assault on the seminal case of <u>Quast v. Prudential Property & Casualty Co.</u>, 267 N.W.2d 493 (Minn. 1978), a case his counsel labels "obnoxious." (Doc. No. 38 at 1.) Because that case is key to the Court's analysis, it is discussed in some detail below.

In <u>Quast</u>, the plaintiff had purchased a home with the intention of residing there until he remodeled and resold it, but financial difficulties caused him to list it for sale sooner than expected. 267 N.W.2d at 493-94. The house languished on the market for several months and was still for sale when it was destroyed by an explosion and fire that occurred at approximately 10 p.m. on the night in question. <u>Id.</u> at 494. At the time the fire broke out the plaintiff "was at a bar where he claimed to have been since approximately 7 p.m., when he left his home after locking all the doors." <u>Id.</u>

After the plaintiff's insurance company denied his claim, he sued for payment of the policy proceeds. At trial, the insurer offered evidence that an accelerant had been used to start the fire, and there was no other evidence indicating an accidental cause. The plaintiff, however, testified that he did not set the fire. <u>Id.</u> The jury returned a special verdict finding that the fire was incendiary in origin and that the plaintiff had participated in setting it. The plaintiff then moved for judgment notwithstanding the verdict, which

the trial court denied.  An appeal followed, with the plaintiff challenging the sufficiency of the evidence to support the verdict.  Id. at 494-95.

The Minnesota Supreme Court affirmed.  It noted that while the evidence introduced by the insurer was "largely circumstantial," courts routinely permitted such evidence "to support the inference that the insured set the fire or arranged to have it set":

> In Elgi Holding, Inc. v. Insurance Co. of North America, 511 F.2d 957 (2d Cir. 1975), for example, the court held that proof of the fire's incendiary origin plus evidence of the insured's financial difficulties which suggested a motive were sufficient to support a jury verdict for the insurance company.  Similarly, in Fenton Country House v. Auto-Owners Ins. Co., 63 Mich. App. 445, 450, 234 N.W.2d 559, 561 (1975), the court stated that "[a]rson [could] be proven through evidence tending to show motive and opportunity, together with evidence negating accidental cause."
>
> The evidence introduced in this case, although largely circumstantial, was clearly sufficient to support the jury's verdict. Appellant was deeply in debt and had tried unsuccessfully more than once to sell his house.  This information alone would permit the jury to infer motive which, together with the fire's incendiary origin, is enough to defeat appellant's claim for payment under the insurance policy.  Because this is a civil case and not a criminal one, arson must be shown only by a preponderance of the evidence rather than beyond a reasonable doubt. Thus, respondent's failure to demonstrate that appellant knew of or participated in the crime does not defeat the jury's decision in its favor as long as credible evidence of motive is introduced.

Id. at 495-96 (citations omitted).  Following Quast, Minnesota courts have repeatedly held that "[e]vidence of [a] fire's incendiary nature, combined with evidence of motive, is sufficient to support a finding of arson."  Reitzner v. Am. Family Mut. Ins. Co., No. A08-0747, 2009 WL 910998, at *4 (Minn. Ct. App. Apr. 7, 2009) (internal quotation marks and citation omitted); accord, e.g., Summit Fid. & Sur. Co. v. Don Stern Enters., Inc., No. CE-95-2099, 1996 WL 266419, at *3 (Minn. Ct. App. May 21, 1996); Montgomery v. N. Star Mut. Ins. Co., No. C2-93-64, 1993 WL 430347, at *1 (Minn. Ct. App. Oct. 26,

1993); DeMarais v. N. Star Mut. Ins. Co., 405 N.W.2d 507, 509 (Minn. Ct. App. 1987);

see also Minn. Fair Plan v. Neumann (In re Neumann), 374 B.R. 688, 694-95 (Bankr. D.

Minn. 2007).

Although Quast was the Minnesota Supreme Court's first decision on this issue, it

was hardly novel.  Indeed, courts had recognized for years that financial motive

combined with incendiary origin were sufficient to create a jury question on arson.  See,

e.g., Raphtis v. St. Paul Fire & Marine Ins. Co., 198 N.W.2d 505, 509-10 (S.D. 1972)

(collecting cases).  That is largely borne of necessity:  because "[o]ne could scarcely be

expected to set fire to his property in the presence of others," proof in arson cases

"consists almost wholly of circumstantial evidence."  Klein v. Auto Owners Ins. Co., 39

F.R.D. 24, 26 (D. Minn. 1965) (Devitt, J.) (citations omitted).

## 2. The so-called Erie problem

Recognizing that Quast provides a serious hurdle for his claim, Weber has put

forward a creative argument in an unsuccessful attempt to avoid it.  He asserts that Quast

created a procedural rule that must be rejected by the Court, pursuant to Erie Railroad Co.

v. Tompkins, 304 U.S. 64 (1938), because there is a "direct collision" between it and

Federal Rule of Civil Procedure 56.  (Pl. Mem. in Supp. at 14.)  This is so, according to

Weber, because evidence of motive plus an incendiary origin fails to create a triable issue

under the "federal rule" – rather, an insurer must also proffer evidence indicating the

insured had the "opportunity" to set the fire in order to survive summary judgment.  (See

Pl. Mem. in Supp. at 11, 15.)

Under Erie, "in a suit based on diversity of citizenship jurisdiction[,] the federal courts apply federal law as to matters of procedure but the substantive law of the relevant state." In re Baycol Prods. Litig., 616 F.3d 778, 785 (8th Cir. 2010) (citations omitted). Where a federal procedural rule "control[s] [an] issue" and "leav[es] no room for the operation" of conflicting state law, the state law must yield. Burlington N. R.R. Co. v. Woods, 480 U.S. 1, 4-5 (1987). But when there is no such collision, the state rule should be applied to accomplish Erie's "twin aims" of discouraging forum shopping and promoting equitable administration of the laws. Hanna v. Plumer, 380 U.S. 460, 468 (1965).

Here, the Court concludes that there is no "direct collision" between Quast and Rule 56, because Quast is a substantive rule, not a procedural one.[7] Quast simply sets forth the way in which an insurer may defend a claim on the basis of supposed arson, namely, by proffering evidence of motive and incendiary origin; it sets forth the *elements* of an insurer's arson defense. Accordingly, it is substantive for Erie purposes. See, e.g., Marshall v. Marshall, 547 U.S. 293, 313 (2006) ("It is clear, under Erie, that Texas law governs the substantive elements of [a] tortious interference claim."); Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 13–14 (1983) (state law determined elements of tax levy cause of action). Rule 56, by contrast, defines the quantum of evidence necessary to support that defense: sufficient evidence to create a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In other words, Quast

---

[7] Under Erie, it makes no difference that Quast is a judge-made rule rather than a legislative one. See Erie, 304 U.S. at 78 ("[W]hether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern.").

defines *which* facts are material, while Rule 56 sets forth the *way to determine* whether those facts are genuinely in dispute.

Accordingly, there is no support for Weber's contention that Rule 56 requires the displacement of Quast. Rather, the two are easily harmonized: an insurer can defend with evidence of motive and incendiary origin (Quast) but will survive summary judgment only if it proffers sufficient evidence to put them genuinely into dispute (Rule 56). It is for this reason that federal courts routinely look to state law when determining how an insurer may prove arson, whether at the summary-judgment stage or otherwise. See, e.g., Ciao Giuseppe, Inc. v. Reliance Ins. Co., 74 F.3d 1245 (Table), 1996 WL 21644, at *1-2 (9th Cir. Jan. 19, 1996) (unpublished) (review of summary judgment); State Auto Prop. & Cas. Ins. Co. v. Hargis, Civ. A. No. 4:09CV-15-M, 2010 WL 1662179, at *2 (W.D. Ky. Apr. 23, 2010) (summary judgment); St. Paul Fire & Marine Ins. Co. v. Salvador Beauty Coll., Inc., 731 F. Supp. 348, 350 (S.D. Iowa 1990) (judgment notwithstanding verdict); Demyan's Hofbrau, Inc. v. INA Underwriters Ins. Co., 542 F. Supp. 1385, 1386 (S.D.N.Y. 1982) (fact finding following bench trial).

Based on the foregoing, the Court is obligated to apply Quast here.[8]

---

[8] To be precise, the Erie inquiry does not end upon the determination that there is no collision between state and federal law. Rather, the Court must also determine whether applying state law would disserve Erie's goals of avoiding forum shopping and equitably administering the law. Walker v. Armco Steel Corp., 446 U.S. 740, 752-53 (1980). That is not the case here. Indeed, if this Court were to apply a more-stringent standard for insurers claiming arson than Minnesota state courts, insureds would have a "dramatic incentive to forum shop." Burke v. Air Serv Int'l, Inc., __ F. Supp. 2d __, 2011 WL 1237625, at *4 (D.D.C. Mar. 30, 2011) (state evidentiary rule "imposing a significant hurdle that plaintiffs would plainly rather avoid" was substantive for purposes of Erie).

### 3.    There is sufficient evidence to support Travelers' arson defense

That <u>Quast</u> controls the Court's analysis does not end the inquiry; the Court must apply that case to the facts and determine whether Travelers has proffered sufficient evidence of the fire's incendiary origin and a financial motive for Weber to set the fire. Weber acknowledges that evidence of his poor financial state at the time of the fire is sufficient to satisfy <u>Quast</u>'s motive prong. (Pl. Mem. in Supp. at 4.) He argues, however, that Travelers lacks sufficient evidence of the fire's incendiary origin. The Court does not agree.

The crux of Weber's argument concerns the conclusions in Steinbach's October 15, 2009 Investigation Report. He contends that Steinbach's opinion was flawed because it (i) was based on inadmissible evidence (stale criminal convictions), (ii) was not given to a "reasonable degree of professional certainty," and (iii) improperly relied on evidence of Weber's financial condition – the *other* prong of <u>Quast</u> – to establish incendiary origin. (<u>Id.</u> at 5-9.) He therefore urges the Court to ignore the report's conclusion that he started the fire. And according to Weber, "[i]n the absence of [Steinbach's] opinion, there is insufficient circumstantial evidence" of an incendiary origin because "[t]here is no evidence of where the fire originated," "no evidence of how the fire started," and "no evidence that accelerants, timing devices, fuses, or other material often associated with arson fires, was involved in this" case. (<u>Id.</u> at 9-10.)

It is true that Steinbach could not offer an opinion, based on the *physical evidence* at the scene, whether the fire was intentionally set. He gave only generalities about where the fire originated. He could not identify accelerants or other flammable chemicals

often found in arson cases.  His opinion was largely based on Weber's poor financial

condition, which the Eighth Circuit has indicated is not relevant to a finding of incendiary

origin (only motive).  See St. Paul Fire & Marine Ins. Co. v. Salvador Beauty Coll., Inc.,

930 F.2d 1329, 1332 (8th Cir. 1991).  And his opinion that the fire resulted from arson

was, indeed, somewhat equivocal.

Nevertheless, Weber's argument founders because even if the Court were to

ignore Steinbach's opinions, there exists other circumstantial evidence in the record

creating a genuine issue for trial.  First, Weber submitted a claim for fire damage barely

four months before the fire in question here.  Courts have noted that several fires in short

succession suggest arson.  See, e.g., Arms v. State Farm Fire & Cas. Co., 731 F.2d 1245,

1249 (6th Cir. 1984); Cora Pub, Inc. v. Cont'l Cas. Co., 619 F.2d 482, 484 (5th Cir.

1980).  Second, Steinbach indicated in an Affidavit that he "attempted, but was unable to

identify, an accidental cause for the subject fire."  (Steinbach Aff. ¶ 6.)  Weber takes

issue with that assertion, claiming that Steinbach "was unable to identify an intentional

cause of the . . . fire either."  (Pl. Reply at 3 n.1.)  That is true, but also of no moment.

The question is:  what reasonable *inference* can be drawn from the absence of evidence

suggesting an accidental cause?  Clearly, one permissible inference is arson.  See, e.g.,

Fitzgerald v. Great Cent. Ins. Co., 842 F.2d 157, 158 (6th Cir. 1988) (expert's opinion

appropriately suggested arson where expert "eliminated all other natural or accidental

causes in the area where the fire originated"); Cora Pub, 619 F.2d at 485 (same);

Reitzner, 2009 WL 910998, at *5 (insurer made "strong showing that the fire was

incendiary" by "eliminating all accidental causes"); U.S. Fire Ins. Co. v. Dace, 305

N.W.2d 50, 54 (S.D. 1981) (deputy fire marshal's inability to find evidence of accidental cause "important" evidence of arson). And notably, Weber has offered no evidence – expert or otherwise – indicating that the cause of the fire was accidental. See Quast, 267 N.W.2d at 494 (pointing out that "no explanation of [the fire's] origin other than an incendiary one was offered by any witness called by either party").

There also exists other circumstantial evidence suggesting an incendiary origin. For instance, Weber was not home at the time the fire broke out. See DeMarais, 405 N.W.2d at 511. By his own admission, he was the last person in his (otherwise unoccupied) house before the fire began, and he locked the doors and secured the windows before leaving. Furthermore, there is no evidence that anyone other than Weber had the keys to the premises. These are often found to be telltale signs in arson cases. See, e.g., Fitzgerald, 842 F.2d at 159; Ins. Co. of N. Am. v. Musa, 785 F.2d 370, 373 (1st Cir. 1986); Hargis, 2010 WL 1662179, at *2; Raphtis, 198 N.W.2d at 509 ("The last person to leave a building before a fire creates a circumstance which courts have deemed important in arson cases." ).

When viewed in the light most favorable to Travelers, the record contains sufficient evidence from which a jury could find both incendiary origin and financial motive. Weber's Motion, therefore, must be denied.

### 4.      The result would be the same without Quast

Notably, the Court would reach the same conclusion even if Quast were not controlling. As discussed above, Weber argues that an insurer cannot survive summary judgment under the "federal rule" without evidence showing, in addition to motive and

incendiary origin, that the insured had an "opportunity" to set the fire.  (See Pl. Mem. in Supp. at 11, 15.)[9]  He claims that the record lacks evidence showing such an "opportunity" here because he has proffered an alibi:  he was passed out in his trailer in Mabel Murphy's' parking lot when the fire started.  (See Pl. Mem. in Supp. at 17-20.)  And he argues that in order to overcome this alibi, Travelers must "offer direct evidence tending to show he was in Sauk Centre at the time of the fire."  (Id. at 20.)

But Weber offers no support for this "direct evidence" argument, which is inimical to the legion of cases discussed above holding that arson may be proved by circumstantial evidence.  Moreover, contrary to his assertion, there *does* exist circumstantial evidence of "opportunity" here.  Weber acknowledges that he was the last person in his (otherwise unoccupied) house before the fire began, and he locked the doors and secured the windows before leaving.  These facts suffice to show "opportunity."  See, e.g., Fitzgerald, 842 F.2d at 159 ("[A]ccess to the building is a sufficient showing of opportunity."); Musa, 785 F.2d at 373 (insurer "presented evidence showing that [the insured] had an almost unique opportunity to set (or to arrange the setting of) the fire" when it proffered testimony that insured was "the last person to leave the store before the fire occurred" and had "the only known set of keys"); Hargis, 2010 WL 1662179, at *2 (opportunity to set fire shown by, *inter alia*, evidence that insured "was the only person who had a key"

---

[9] Weber argues that "Minnesota [courts] ha[ve] never been confronted with a case which involves . . . *three* factors in a circumstantial evidence/arson case, viz: motive, incendiary origin, and ***opportunity***."  (Pl. Mem. in Supp. at 17 (emphases in original).)  He is mistaken.  See Montgomery, 1993 WL 430347, at *1 ("Appellant also argues the evidence is insufficient to sustain a finding that she . . . caused the fire since North Star presented no evidence placing her . . . in the vicinity of the house within several hours of the fire.  *It is not necessary, however, for North Star to present such evidence as long as there was evidence of the fire's incendiary nature combined with evidence of motive.*") (emphasis added).

and "was the last person in the house before the fire started"); 10A Lee R. Russ &

Thomas F. Segalia, <u>Couch on Insurance</u> § 149:59 (3rd ed. 2010) ("[O]pportunity to set [a

fire] may be shown by . . . access to the building.").  Indeed, Weber appears to recognize

that evidence of access alone will suffice.  (<u>See</u> Pl. Mem. in Supp. at 11 (arguing he is

entitled to summary judgment because Travelers "cannot produce evidence that [he] had

opportunity *or access to the house in question near the time the fire started*") (emphasis

added).)

     That Weber denies being in the area at the time of the fire cannot be dispositive

because a jury is free to disbelieve him.  His assertion that he "was not in the vicinity of

[his] home at the time of the fire merely creates a jury question."  <u>Hargis</u>, 2010 WL

1662179, at *2 n.4; <u>see also</u> <u>Zane v. Home Ins. Co. of N.Y.</u>, 254 N.W. 453, 454 (Minn.

1934) (fact that plaintiff was in out-of-town hospital for six days before fire not

dispositive, as "his participation could be proved by circumstantial evidence").

     At bottom, the Court concludes that the record contains sufficient evidence to

create a jury question on Travelers' arson defense.

     **B.     Leave to amend**

     In his Motion, Weber also seeks leave to amend his Complaint to add a cause of

action for bad-faith denial of his claim, pursuant to Minnesota Statutes Section 604.18.

In pertinent part, that statute provides that an insured may recover costs, attorneys' fees,

and similar damages if he can show that his insurer "lacked a reasonable basis for

denying the benefits of the insurance policy" and "knew" or acted in "reckless disregard"

thereof.   Minn. Stat. § 604.18, subd. 2(a).  An insured may not allege such a claim in his

complaint, but rather must "make a motion to amend the pleadings to claim [such] recovery." Id. subd. 4(a).

Here, Travelers argues that amendment should be denied because it is (1) futile and (2) untimely. (Def. Mem. in Opp'n at 15-20.) The Court agrees with the latter argument and, accordingly, it need not consider the former.

Although leave to amend typically is granted liberally under Federal Rule of Civil Procedure 15, different considerations apply when a party seeks amendment beyond the deadline set in a scheduling order. See, e.g., Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 610 (8th Cir. 2011) ("When a party moves for leave to amend outside the district court's scheduling order, Fed. R. Civ. P. 16(b), not the more liberal standard of [Rule 15], governs."). Under Rule 16(b), a plaintiff seeking an untimely amendment is required to show "good cause to modify the schedule." Id. (internal quotation marks and citation omitted). "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." Id. (citations omitted).

The Pretrial Scheduling Order in this case set October 1, 2010, as the deadline for amendment. Weber's Motion is therefore untimely, and he must make a sufficient showing of good cause to be permitted to amend. The Court determines that he has failed to do so.

Notably, Weber has been alleging from the outset that Travelers' handling of his claim evidenced bad faith. Paragraph 9 of the Complaint – which was filed on April 24, 2010, more than five months before the amendment deadline – alleges that Travelers "has claimed, and continues to claim, that it does not have an obligation to pay . . . because

plaintiff either burned [his] residence by arson or caused another to burn [it]. *This claim is made in bad faith and in conscious violation of plaintiff's known rights*." (emphasis added).[10]  He makes the same allegation now in support of his request to amend.  Hence, there is simply no reason Weber could not have sought amendment long ago, well before the deadline set in the Pretrial Scheduling Order.

Weber argues that a motion for leave to assert a bad-faith claim requires a plaintiff to await the close of discovery because it must be supported by sufficient evidence, "which is obviously going to be strongest only after all the evidence produced in discovery is 'in.'"  (Pl. Reply at 7-8.)  But nothing requires a plaintiff seeking such an amendment to await receipt of the "strongest" or "best" evidence to support his motion.  Rather, a plaintiff must make only a *prima facie* showing of bad faith, based on "one or more affidavits showing the factual basis" for the claim.  Minn. Stat. § 604.18, subd. 4(a).  Discovery need not have closed before a plaintiff can make such a showing.  Weber also argues that a "prudent attorney will ordinarily not make a motion to include either punitive damages or bad faith insurance practice until he knows everything that the defendant has to offer."  (Pl. Reply at 8.)  But the *defendant's* evidence is irrelevant to the determination.  This is made clear by the analogous procedure for amending a complaint to add a claim for punitive damages – when reviewing such a motion, courts look only at

---

[10] Although Weber included allegations regarding Travelers' so-called "bad faith" in his Complaint, he did not plead a separate bad-faith *claim*.  Travelers nevertheless has cross-moved for summary judgment on that "claim."  (<u>See</u> Def. Mem. in Supp. at 16-20.)  If such a claim were in the Complaint, however, Weber would not need leave to add it.

the *plaintiff's* evidence.  See, e.g., Harris v. Wal-Mart Stores, Inc., Civ. No. 07-1191,

2007 WL 4284854, at *2 (D. Minn. Nov. 30, 2007) (Kyle, J.) (collecting cases).

Weber has simply failed to point to any evidence he needed to uncover in

discovery before bringing his Motion.  Under these circumstances, he has not

demonstrated "good cause" for failing to seek amendment before the deadline, and his

request will be denied.[11]

## II.      Travelers' Motion will be denied

Travelers argues it is entitled to dismissal of Weber's Complaint for two reasons.

First, it argues that this action was prematurely filed because it was still investigating

Weber's claim when he commenced suit in April 2010.  It next argues that Weber failed

to comply with several conditions precedent in his policy.  Neither contention has merit.

### A.      The alleged prematurity

Travelers asserts that it "was in the middle of conducting its claim investigation

and had not made a decision with respect to Weber's claim at the time th[is] suit was

commenced."  (Def. Mem. in Supp. at 13.)  Without having actually denied Weber's

claim, it argues, he cannot show a breach of the policy.  The Court does not agree.

On January 7, 2010, long before Weber filed suit, Travelers sent him a letter

advising that it was "rejecting" his Sworn Statement in Proof of Loss.  While this letter

did not use the magic words "deny" or "denial," the Court fails to see a practical

---

[11] Weber also argues that Travelers will not be prejudiced by a belated amendment because it has
known since the Complaint was filed that he was alleging bad faith.  (Pl. Reply at 8.)  In the
absence of "good cause," however, a court generally should not reach the question of prejudice.
See, e.g., Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 717 (8th Cir. 2008).

difference.  Travelers is attempting to hide behind semantics – its "rejection" was, in the Court's view, the functional equivalent of a denial.  Were it otherwise, insurers could "reject" claims without actually "denying" them, thereby avoiding the various statutory protections afforded to Minnesota insureds.  See, e.g., Minn. Stat. § 72A.20, subd. 12(5) (unlawful for insurer to "fail[] to affirm or *deny* coverage within a reasonable time") (emphasis added); Minn. Stat. § 72A.201, subd. 4(3)(i) (providing 30 days for insurer to "inform the insured . . . of [its] acceptance or *denial* of a claim . . . unless the investigation cannot reasonably be completed within that time") (emphasis added).

Moreover, the letter provided that Travelers' investigation would not be finished until "Weber's examination under oath is completed and the investigation by the fire marshal for the State of Minnesota is also completed."  Yet, Steinbach's investigation was complete on October 15, 2009, three months *before* the letter was sent, and Weber's examination under oath was completed on January 18, 2010.  In other words, by Travelers' own acknowledgement, it possessed the information necessary to decide Weber's claim several months before he filed suit.  There is no indication in the record, however, that Travelers took any steps during those months to do so.

In these circumstances, the Court believes that Travelers, at a minimum, *constructively* denied Weber's claim.  Notably, Minnesota courts have recognized that an insurer can constructively deny a claim through its conduct.  See, e.g., Perry v. State Farm Mut. Auto. Ins. Co., 506 F. Supp. 130, 134 (D. Minn. 1980) (MacLaughlin, J.); In re Claims for No-Fault Benefits Against Progressive Ins. Co., 720 N.W.2d 865, 871 n.2

(Minn. Ct. App. 2006).[12]  Travelers, too, recognizes the concept of constructive denial.

(See Def. Reply at 8 (arguing that there was no constructive denial in this case).)  And

where, as here, an insurer possesses the information necessary to decide an insured's

claim but fails to act on that information, the claim is constructively denied.  See Durkin

v. Allstate Ins. Co., Civ. A. No. 90-346, 1991 WL 42562, at *1 n.3 (E.D. La. Mar. 21,

1991) (noting that "when an insurer [fails] to respond to a timely filed notice of loss, . . .

that insurer has constructively refused to participate in an ascertainment of the loss and

has effectively denied the claim").

      Accordingly, the Court rejects Travelers' argument that this action should be

dismissed as prematurely filed.[13]

### B.    The alleged failure to cooperate

      Travelers next argues that Weber failed to cooperate with its investigation because

he did not sign the transcript of his examination under oath, failed to re-submit a Sworn

Statement in Proof of Loss, and failed to provide authorizations for his cell phone

records.  (Def. Mem. in Supp. at 16.)  As a result, it contends that this action must be

dismissed because Weber transgressed the policy's "suit against us" clause, which

provides that "[n]o action can be brought against us unless there has been full compliance

with all of the terms . . . of this policy."  This argument fails.

---

[12] Minnesota courts are not unique in this regard.  See, e.g., Jones v. Gen. Ins. Co. of Am., Civ.
A. No. 07-0855, 2009 WL 1537866, at *11 (S.D. Ala. May 29, 2009); Durkin v. Allstate Ins.
Co., Civ. A. No. 90-346, 1991 WL 42562, at *1 n.3 (E.D. La. Mar. 21, 1991).

[13] Moreover, even if the claim could not be considered "denied" at the time Weber filed suit,
surely it has been constructively denied by now, nearly two years after the fire occurred,
essentially rendering this argument moot.

The Court has recently been down this road.  In Martin v. State Farm Fire &

Casualty Co., __ F. Supp. 2d __, 2011 WL 2437060 (D. Minn. June 16, 2011) (Kyle, J.),

a case with remarkably similar facts to the instant action, the plaintiff Martin's home

suffered fire damage; State Farm denied his claim on several grounds and, when he sued,

it moved for summary judgment, arguing that the action was barred because Martin had

failed to (i) timely submit a Sworn Statement in Proof of Loss and (ii) sit for an

examination under oath, thereby violating several cooperation clauses in his policy.  The

Court rejected this argument because "[i]t has long been recognized in Minnesota" that a

timely proof of loss and an examination under oath are not "condition[s] precedent to

suit," but rather "condition[s] precedent to recovery."  Id. at *4 (emphases in original)

(collecting cases).  The Court perceives no reason to deviate from Martin or repeat herein

the analysis in that case.  For the reasons stated in Martin, the Court rejects Travelers'

argument that Weber's "failure to fulfill [his] duties of cooperation under the [p]olicy

precludes him from bringing this action against Travelers."  (Def. Mem. in Supp. at 16

(emphasis added).)  And it makes no difference that Weber's policy expressly provided

that cooperation was a condition precedent to suit – as noted in Martin, such a provision

cannot be enforced.  See 2011 WL 2437060, at *5 (citing Greene v. W. Bend Mut. Ins.

Co., No. A10-1031, 2011 WL 292151, at *2-3 (Minn. Ct. App. Feb. 1, 2011)).[14]

---

[14] At oral argument, Travelers seized on Martin's distinction between the right to sue and the
right to recovery, which emanated from several Minnesota Supreme Court decisions, including
Nathe Bros., Inc. v. American National Fire Insurance Co., 615 N.W.2d 341 (Minn. 2000).  It
argued that even if Weber enjoys the right to sue, it cannot have breached the policy by failing
to pay him because he has no right to recovery, due to his alleged failure to cooperate.  In the
absence of any breach, Travelers argues that Weber's claim must be dismissed.  The Court

The undersigned also noted in <u>Martin</u> that an "insured's failure to timely submit a proof of loss is not fatal to his claim unless the insurer can 'show it was prejudiced' as a result." 2011 WL 2437060, at *6 (quoting <u>Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co.</u>, 615 N.W.2d 341, 347 (Minn. 2000)). Travelers has nowhere argued that Weber's ostensible "lack of cooperation" was prejudicial, and there is no prejudice evident to the Court. Notably, Weber *has* submitted to an examination under oath; he simply has not signed the transcript of that examination. It would be difficult for Travelers to argue, therefore, that it lacks the information necessary to adjudicate his claim. Nor can it credibly claim that it could not marshal such information *by now*, given the panoply of discovery devices available to it in this litigation. For instance, Travelers assails Weber's failure to provide authorizations for his cell-phone records, and yet it acknowledges that it subpoenaed those records. (Def. Reply at 5.) Simply put, the Court perceives no prejudice here.[15]

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Weber's Motion for Partial Summary Judgment and Amendment of

---

cannot agree with this circular argument. Indeed, if Travelers' argument were correct, there would have been no need for <u>Nathe Bros.</u> (and the other cases discussed in <u>Martin</u>) to distinguish between the right to sue and the right to recovery – they would have simply held that there had been no breach and affirmed the dismissal of the insureds' claims.

[15] It is possible that Weber's failure to submit a revised Sworn Statement in Proof of Loss was prejudicial, but it is impossible for the Court to make that determination on the current record. Notably, Weber's original Sworn Statement in Proof of Loss has not been submitted with the parties' Motion papers, and hence the Court cannot discern whether it was so lacking in detail that Travelers reasonably required a revised one.

Complaint (Doc. No. 46) and Travelers' Motion for Summary Judgment (Doc. No. 41)

are **DENIED**.[16]


Date:  July 13, 2011


                                                    s/Richard H. Kyle
                                                    RICHARD H. KYLE
                                                    United States District Judge

---

[16] The Court reminds the parties that this case is on its September 2011 trial calendar.  The parties should be fully prepared to try this matter in September 2011 (although trial will not be scheduled during defense counsel's previously indicated family vacation).